UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 97-10342-GAO

IAIN FRASER; STEVE TRITTSCHUH; SEAN BOWERS;
MARK SEMIOLI; RHETT HARTY; DAVID SCOTT VAUDREUIL;
MARK DODD; and MARK DOUGHERTY,
Plaintiffs

v.

MAJOR LEAGUE SOCCER, L.L.C.; KRAFT SOCCER, L.P.; ANSCHUTZ SOCCER, INC.;
ANSCHUTZ CHICAGO SOCCER, INC.; SOUTH FLORIDA SOCCER, L.L.C., TEAM
COLUMBUS SOCCER, L.L.C.; TEAM KANSAS CITY SOCCER, L.L.C.; LOS ANGELES
SOCCER PARTNERS, L.P.; EMPIRE SOCCER CLUB, L.P.;
WASHINGTON SOCCER, L.P.; and UNITED STATES SOCCER FEDERATION, INC.,
Defendants

MEMORANDUM AND ORDER
April 19, 2000

O'TOOLE, D.J.

The individual plaintiffs are the representatives of the certified class of professional soccer

players who are or who have been employed by the defendant Major League Soccer, L.L.C.

("MLS"). MLS is a limited liability company ("LLC") organized under Delaware law. See generally

Del. Code Ann. tit. 6, §§ 18-101, et. seq. (1996). The defendant United States Soccer Federation,

Inc. ("USSF") is the national governing body for professional and amateur soccer in the United

States. All the other defendants are investors in MLS, each a capital-contributing member of MLS

that has contracted with MLS to operate one or more of MLS's teams.[1]

The plaintiffs assert a number of antitrust claims. In Count I, they allege that MLS and

several of its investors who operate MLS teams (hereafter "operator-investors" or "operators") have

---

[1] MLS and its members may sometimes hereinafter be referred to collectively as the "MLS
defendants."

unlawfully combined to restrain trade or commerce in violation to § 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1, by contracting for player services centrally through MLS, effectively eliminating the competition for those services that would take place if each MLS team were free to bid for and sign players directly. In Count II, the plaintiffs assert as a second § 1 claim that all the defendants have conspired to impose anticompetitive "transfer fees" on player relocation that have the effect of restricting the ability of soccer players to move from one team to another, thus dampening competition for players' services worldwide. Count III alleges that all defendants have jointly exercised monopoly power in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. In Count IV, the plaintiffs allege that the transaction which brought MLS into existence violated § 7 of the Clayton Act, 15 U.S.C. § 18. Finally, the plaintiffs assert in Count V a California state law claim that certain contracts concerning players' promotional rights were unlawful contracts of adhesion. The plaintiffs seek declaratory and injunctive relief as well as damages.

The plaintiffs have moved for summary judgment as to the defendants' so-called "single entity" defense. (Answer to Am. Compl., First Aff. Def.) The gist of their argument is that although MLS appears to be a single business entity, so that its method of hiring players centrally can be characterized as the act of a single economic actor for antitrust purposes, the organizational form is really just a sham that should be considered ineffective to insulate from condemnation what are in substance illegal horizontal restraints on the hiring of players resulting from the unlawful concerted behavior of the several MLS team operators. The MLS defendants have filed a cross-motion for summary judgment in their favor dismissing Count I, arguing that MLS, as a single entity, cannot commit a § 1 violation. The MLS defendants have also moved for summary judgment on Count IV, the plaintiffs' Clayton Act claim.

2

## I. RELEVANT FACTS

The following material facts are not subject to genuine dispute.  At the time MLS was formed, no "Division I" or "premiere" professional outdoor soccer league operated in the United States.  The last premiere soccer league to operate in this country had been the North American Soccer League ("NASL"), which led a turbulent existence from 1968 until the mid-1980s, when it collapsed.  In 1988, Federation Internationale de Football Association ("FIFA") awarded to the United States the right to host the 1994 World Cup, soccer's illustrious international competition. In consideration for that award, the organizers of the event promised to resurrect premiere professional soccer in the United States.

In the early 1990s, Alan Rothenberg, the President of USSF and of World Cup USA 1994, with assistance from others began developing plans for a Division I professional outdoor soccer league in the United States.  Rothenberg and others at the USSF consulted extensively with potential investors in an effort to understand what type of league structure and business plan they might find attractive.  He also consulted antitrust counsel in the hope of avoiding the antitrust problems which other sports leagues such as the National Football League ("NFL") had encountered.  Eventually the planners settled on the concept of organizing a limited liability company to run the league, and in 1995 MLS was formed.

3

The structure and mode of operation of MLS is governed by its Limited Liability Company Agreement ("MLS Agreement" or "Agreement"). The MLS Agreement establishes a Management Committee consisting of representatives of each of the investors. The Management Committee has authority to manage the business and affairs of MLS. Several of the investors have signed Operating Agreements with MLS which, subject to certain conditions and obligations, give them the right to operate specific MLS teams.[2] There are also passive investors in MLS who do not operate teams. None of the passive investors is a defendant here.

Operator-investors do not hire players for their respective teams directly. Rather, players are hired by MLS as employees of the league itself and then are assigned to the various teams. Each player's employment contract is between the player and MLS, not between the player and the operator of the team to which the player is assigned. MLS centrally establishes and administers rules for the acquisition, assignment, and drafting of players, and all player assignments are subject to guidelines set by the Management Committee. Among other things, the guidelines limit the aggregate salaries that the league may pay its players.

Under applicable player assignment policies, MLS centrally allocates the top or "marquee" players among the teams, aiming to prevent talent imbalances and assure a degree of comparability of team strength in order to promote competitive soccer matches. These assignments are effective unless disapproved by a two-thirds vote of a subcommittee of the Management Committee. Most of the rest of the players – the non-"marquee" players – are selected for teams by the individual operator-investors through player drafts and the like. The league allows player trades between teams,

---

[2] The league itself is authorized by the MLS Agreement to operate teams directly and currently operates two teams (the Dallas Burn and the Tampa Bay Mutiny).

but MLS's central league office must approve (and routinely does approve) such trades. Team operators are not permitted to trade players in exchange for cash compensation.

MLS distributes profits (and losses) to its investors in a manner consistent with its charter as a limited liability company, not unlike the distribution of dividends to shareholders in a corporation. Revenues generated by league operations belong directly to MLS. MLS owns and controls all trademarks,[3] copyrights, and other intellectual property rights that relate in any way either to the league or to any of its teams. MLS owns all tickets to MLS games and receives the revenues from ticket sales. There are central league regulations regarding ticket policies, even including limits on the number of complimentary tickets any team may give away. Team operators do retain the ability to negotiate some purely local matters, including local sponsorship agreements with respect to a limited array of products and services and local broadcast agreements, but they do so as agents of MLS.

Under the Operating Agreement, each team operator receives from MLS a management fee. As of the time this action was filed, the management fee consisted of (a) 100% of the first $1.24 million, and 30% of the excess over $1.24 million, of local television broadcast and sponsorship revenues, the latter percentage subject to some specified annual increase; (b) 50% of ticket revenues from home games, increasing to 55% in year six of the league's operation; and (c) 50% of stadium revenues from concessions and other sources.

---

[3] Operators retain security interests in team trademarks.

5

Expenses are allocated in a way similar to the allocation of revenues.  MLS is responsible for most expenses associated with league operations.  For example, MLS pays all player acquisition costs, player salaries, and player benefits.  It also pays the salaries of all league personnel (including referees), game-related travel expenses for each team, workers' compensation insurance, fees and expenses of foreign teams playing in exhibition games promoted by MLS within the U.S., league-wide marketing expenses, and 50% of each individual team's stadium rental expense.

The team operators are responsible for the other half of their stadium rents, costs of approved local marketing, licensing, and promotion, and general team administration, including salaries of the team's management and coaching staff.

Passive investors do not pay any team operating expenses or receive any management fee. They share in the general distribution of profits (and losses) resulting from league operations.

Team operators cannot transfer their MLS interests or operational rights without the consent of the Management Committee.  That consent may be withheld without cause, but the league is required to repurchase the team operator's interest at its fair market value if approval is withheld. Team operators derive whatever rights they may have exclusively from MLS, and the league may terminate these rights if a team operator violates these provisions or fails to act in the best interest of the league.

## II.  THE MLS MOTION FOR SUMMARY JUDGMENT

I first consider the defendants' motion for summary judgment.  Summary judgment may be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that  there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  See Celotex

Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material if its resolution would "affect the

outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that

a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986).  That an antitrust claim may be factually and legally complex does not

necessarily preclude the entry of summary judgment; there is no heightened standard for summary

judgment in complex cases. See Capital Imaging Assocs. v. Mohawk Valley Med. Assocs., 996 F.2d

537, 541 (2d Cir. 1993) (antitrust); City of Mount Pleasant v. Associated Elec. Coop., Inc., 838 F.2d

268, 274 (8th Cir. 1988) (same); see also Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d

1147, 1159 (1st Cir. 1994) (complex cases generally).

Most of the material facts necessary to decide the defendants' motion are undisputed. One

possibly material fact that is disputed is the definition of the relevant market for purposes of the § 1

analysis.  In evaluating the defendants' motion, I assume that the relevant market is the market for

Division I professional outdoor soccer in the United States, which is the plaintiffs' position.  In

addition, the plaintiffs are entitled to all reasonable inferences from the undisputed facts.

III. THE OPERATION OF MLS

Section 1 of the Sherman Act forbids contracts, combinations, and conspiracies in restraint

of trade or commerce.  See 15 U.S.C. § 1.  Agreements between separate economic actors that have

the effect of substantially and unreasonably reducing competition in a particular market violate § 1.

The plaintiffs argue that MLS player policies constitute an unlawful agreement among the various

team operators to limit or eliminate competition in the market for players' services.

7

Though the language of § 1 is sweeping, there are some limits to its reach. One critical limitation for the purposes of this case is that the statute does not prohibit single economic entities from acting unilaterally in ways that may, in some manner, decrease competition. See Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984). Because it is directed against contracts, combinations or conspiracies, § 1 only prohibits collective activity by plural economic actors which unreasonably restrains competition. See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769 (1984) ("In any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit."); Mount Pleasant, 838 F.2d at 274 ("A conspiracy requires a plurality of actors. . . ."). The MLS defendants contend that MLS is a "single entity" and that even if its policies and practices have the effect of substantially reducing competition for players' salaries, they do not – *cannot* as a matter of law – violate § 1.

MLS is a limited liability company organized under Delaware law. An LLC is a form of statutory business organization that combines some of the advantages of a partnership with some of the advantages of a corporation.[4] Under Delaware law, an LLC is a separate legal entity distinct from its members. Del. Code Ann. tit. 6, § 18-201(b). As in a corporation, investors (shareholders in a corporation, members in an LLC) have limited liability (id., § 18-303), own undivided interests in the company's property (§ 18-701), are bound by the terms of their Agreement (like the corporate Articles), and share in the overall profits and losses ratably according to their investment or as otherwise provided by the organizing Agreement (§ 18-503). The Federal Trade Commission has treated LLCs like corporations. See In re Monier Lifetile L.L.C., No. 9290 (F.T.C. Mar. 1999)

---

[4] Both corporations and partnerships are strongly presumed to be single entities for the purposes of § 1. See Philip E. Areeda, Antitrust Law ¶ 1476d (1986).

(characterizing Monier Lifetile as a corporation); In re Merck & Co., No. C-3853 (F.T.C. Feb. 18, 1999) (treating Merck-Medco Managed Care L.L.C., as a corporation); In re Shell Oil Co., No. C-3803 (F.T.C. Apr. 21, 1998) (analyzing joint venture LLC in same manner as joint venture corporation).[5]  In the present context, there is little reason to treat an LLC such as MLS differently from a corporation.

MLS's operations should therefore be analyzed as the operations of a single corporation would be, with its operator-investors treated essentially as officers and shareholders.  There can be no § 1 claim based on concerted action among a corporation and its officers, nor among officers themselves, so long as the officers are not acting to promote an interest, from which they would directly benefit, that is independent from the corporation's success.  See Copperweld, 467 U.S. at 770 n.15 (dictum); Greenville Publ'g Co. v. Daily Reflector, Inc., 496 F.2d 391, 399-400 (4th Cir. 1974) (defendant, a newspaper publishing corporation, was accused of trying to destroy plaintiff's

---

[5] In addition, some courts have held, in non-antitrust contexts, that LLCs more closely resemble corporations than partnerships. See Exchange Point LLC v. S.E.C., No. M-30, 1999 WL 386736, at *3 (S.D.N.Y. June 10, 1999) (finding LLC to be more similar to wholly owned corporation than partnership and thus not a person for the purposes of the Right to Financial Privacy Act of 1978); Poore v. Fox Hollow Enterprises, 1994 WL 150872, at *2 (Del. Super. Ct. March 8, 1994) (LLCs sufficiently resemble corporations such that the same rules which require Delaware corporations to retain Delaware counsel to represent them in state courts also apply to LLCs.).
Admittedly, these decisions do not conclusively determine the matter, since the question whether an organization may be liable for a conspiracy in restraint of trade is different from the questions these cases addressed. See Bell Atlantic Bus. Sys. Servs. v. Hitachi Data Sys. Corp., 849 F. Supp. 702, 707 (N.D. Cal. 1994) ("Plaintiff's attempt to equate [Sherman Act] § 1 conspiracy liability with alter ego liability fails because § 1 deals with federal antitrust policies and the alter ego doctrine is governed by California corporation law.  The two legal principles have different purposes and policy considerations."); compare De Castro v. Sanifill, Inc., 198 F.3d 282, 283 (1st Cir. 1999) (wholly-owned subsidiary's activities did not confer personal jurisdiction over parent) with Copperweld, 467 U.S. at 753 (no § 1 liability for parent or wholly-owned subsidiary because the two corporations were a single entity for antitrust purposes).
Nonetheless, the cases do illustrate how courts generally understand the LLC structure to be like that of a corporation and generally apply legal rules applicable to corporations to LLCs as well.

newspaper through predatory pricing; defendant and its president held capable of conspiring under § 1 because president had a stake in a *third* newspaper which would directly benefit from plaintiff's newspaper's elimination).  If an LLC should be considered like a corporation for these purposes, as I conclude it should, then there can be no § 1 violation by reason of concerted action between the LLC as an entity and its members, or between the individual members themselves, unless the members are acting not in the interest of the entity, but rather in their own separate self-interest.  The "independent personal stake" exception has not yet been squarely addressed in this Circuit; recognizing the risk that this exception, if left unchecked, might swallow the rule, courts that employ it have done so conservatively.  See, e.g., Oksanen v. Page Mem'l Hosp., 945 F.2d 696, 705 (4th Cir. 1991) (limiting the scope of the exception to Greenville Publishing's specific rationale); Williams v. 5300 Columbia Pike Corp., 891 F. Supp. 1169, 1174-75 (E.D. Va. 1995) ("narrow" exception applies only if officer acted to serve a self-interest entirely independent of corporation's success).[6]

The plaintiffs argue that even if MLS is deemed a single entity, the divergent self-interests of the operator-investors provides sufficient cause to invoke the independent personal stake exception.  The plaintiffs base this argument largely on their assertion that the operator-investors do not truly share in MLS's profits and losses.  Instead of owning undivided interests in the league that are not attached to the operation of any given team, they pay certain operating expenses individually and receive management fees from MLS that are calculated in large part according to their local team-generated revenues.  Also, they are able to harvest the value of the particular teams they operate

---

[6] Egan v. Athol Mem. Hosp., 971 F. Supp. 37 (D. Mass. 1997), and Benjamin v. Aroostook Med. Ctr., 937 F. Supp. 957 (D. Me. 1996), rejected hospital-physician conspiracy claims similar to the one at issue in Oksanen.  Neither case turned on a square assessment and application of the independent personal stake doctrine.

by selling their operational rights or, if the Management Committee vetoes the sale, by requiring the league to pay them the fair market value of their investment.

The management fee arrangement exists in addition to, not in place of, the overall profit and loss sharing specified in the Agreement. Indeed, the fact that there are passive investors in MLS is strong evidence that the payment of management fees and assignment of local expenses do not account for all economic risks and benefits associated with the league's operation.

Furthermore, successful local operation of a team benefits the entire league. The league's net revenues, not just the local operator's management fees, increase when more local revenues are generated.[7]

A similar effect is foreseeable in the market for operator-investor shares. Admittedly, unlike undifferentiated shares of stock, the market value of a team operator's investment will not simply reflect an aliquot share of the whole enterprise, but will also reflect in certain respects the success of the local operation. Nonetheless, unlike competition in most markets, where the value of an enterprise would usually be enhanced if its competitors grew weaker, the value of the right to operate an MLS team would be diminished, not enhanced, by the weaknesses of other teams, their operators,

---

[7] Any number of businesses, from restaurants to car dealerships to law firms, require their employees and agents to individually assume certain operational costs and reward them with commissions directly tied to individual performance. That such arrangements may reflect incomplete unity of interest is immaterial, see Chicago Prof'l Sports, 95 F.3d at 598 (Complete unity of interest test "would be silly. Even a single firm contains many competing interests."). One would be hard pressed to say that this rather routine business practice scrambles the economic interests within the firm in such a way as to open it up to § 1 scrutiny. See Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1135 (3d Cir. 1995) (company in charge of freight broker's day-to-day operations was paid on percentage of broker's revenue; held that this encouraged efficient operation and made broker and operations company inseparable for § 1 purposes); Coast Cities Truck Sales v. Navistar Int'l Transp. Co., 912 F. Supp. 747, 765 (D.N.J. 1995) (truck manufacturer and associated dealerships were single entity even though each dealership operator received bonus tied to dealership's individual performance).

11

Case 1:97-cv-10342-GAO   Document 267   Filed 04/19/00   Page 12 of 23

and the league as a whole. Management fees and operational rights notwithstanding, every operator-investor has a strong incentive to make the league – and the other operator-investors – as robust as possible. Each operator-investor's personal stake is not independent of the success of MLS as a whole enterprise.

The plaintiffs point to other ways in which the operator-investors compete on and off the field. That teams (and, by extension, their operators) compete playing soccer, and that operators directly hire certain staff, such as coaches, to make teams more capable of on-field heroics, does nothing to assist the plaintiffs.[8] Exciting on-field competition between teams is what makes MLS games worth watching. Cf. Chicago Prof'l Sports, 95 F.3d at 598-99 ("a league with one team would be like one hand clapping"). Game competition, without doubt, is part of the league's entertainment product, not an indicator of divergent economic interests among operators.

On balance, the business organization of MLS is quite centralized. The league owns the teams themselves; disgruntled operators may not simply "take their ball and go home" by withdrawing the teams they operate and forming or joining a rival league. MLS also owns all intellectual property related to the teams. It contracts for local-level services through its operators, who act on its behalf as agents.[9] Operators risk losing their rights to operate their teams if they

---

[8] Giving operators discretion over certain aspects of their duties while withholding it in other areas does not itself reflect disunity of interest. See Williams v. I.B. Fischer, 794 F. Supp. 1026, 1031 (D. Nev. 1992) (franchiser and franchisees held to be single entity for purposes of restraint on poaching other franchisees' managers; franchisees' control over local pricing decisions did not establish lack of unity of interest).

[9] The plaintiffs argue that the operators, since they sit on MLS's Management Committee, are not MLS agents in this regard. That argument fails. Shareholders—even ones in positions of control—are not disqualified from serving as an agent of the corporation, see, e.g., Ed Peters Jewelry Co. v. C & J Jewelry Co., 124 F.3d 252, 275 (1st Cir. 1997).

breach the governing Agreement. The Management Committee exercises supervisory authority over most of the league's activities. It may reject, without cause, any operator's individual attempt to assign the rights to operate a team.

It is true that MLS is run by a Management Committee that can be controlled by the operator-investors, who constitute the majority of the members of the Committee. It is not remarkable that principal investors can collectively control the governing board of an LLC (or of a corporation). That fact hardly proves that the investors are pursuing economic interests separate from the interests of the firm. The notion that the members of the Management Committee of a single firm violate the antitrust laws when they vote together to maximize the price or minimize the cost of the firm's product is easily rejected.

As a factual matter, therefore, there is insufficient basis in the record for concluding that operators have divergent economic interests within MLS's structure. Even if one draws the most favorable inference on the plaintiffs' behalf, there is no reasonable basis for imposing § 1 liability.

MLS's player policies, in particular, do not call for application of the independent personal stake exception. The operator -investors benefit from those policies because centralized contracting for player services results in lower salaries. However, that benefit is, in the MLS structure, a derivative one. No operator has an individual player payroll to worry about; the league pays the salaries. Moreover, the MLS investor gets the lower-cost benefit in exchange for having surrendered the degree of autonomy that team owners in "plural entity" leagues typically enjoy. The reason an individual team owner in one of those other leagues is willing to bid up players' salaries to get the particular players it wants is because by paying high salaries to get desirable players, the owner can achieve other substantial benefits, such as increased sales of tickets and promotional goods, media

13

revenues, and the like.  The MLS operator-investors have largely yielded that opportunity to the central league office.  Plainly, there are trade-offs in the different approaches.  The MLS members have calculated that the surrender of autonomy, together with the attendant benefit of lower and more controlled player payrolls and greater parity in talent among teams, will help MLS to succeed where others, notably NASL, failed. That is a calculation made on behalf of the entity, and it does not serve only the ulterior interests of the individual investors standing on their own.  It is not an occasion for application of the independent personal stake exception to the general single-entity rule described in Copperweld.

The plaintiffs also argue that the structure of MLS is a sham designed to allow what is actually an illegal combination of plural actors to masquerade as the business conduct of a single entity.  The plaintiffs do not argue that the structure of MLS as established by the its organizing Agreement is legally defective so that it should not be recognized as a lawful entity under Delaware law.  Rather, they say that even if MLS is a legitimate LLC – a legitimate single entity for state law purposes – a court should disregard that legal form in evaluating under antitrust principles whether the operator – investors are engaged in a horizontal restraint in the market for players' services.  To make the argument, the plaintiffs put a reverse spin on the Copperweld holding.

Copperweld held that a corporation could not conspire with its wholly owned subsidiary in violation of § 1 because, though the parent and subsidiary were distinct legal entities, the economic reality was that they functioned as a single business enterprise.  Cases following Copperweld have mainly addressed the question whether to disregard formal distinctions among entities in order to find economic singularity for the purposes of § 1.  See, e.g., Sullivan v. NFL, 34 F.3d 1091, 1099 (1st Cir. 1994) (NFL, composed of separately owned clubs, not a single entity in the market for

ownership of teams);[10] Chicago Prof'l Sports Ltd. Partnership v. NBA, 95 F.3d 593, 597-600 (7th Cir. 1996) (characterizing NBA, composed of separately owned clubs, as a single entity for the purpose of league-wide limitations on locally televising games through "superstations," though expressly withholding judgment as to whether NBA was single entity in other markets, such as player contracting); Oksanen, 945 F.2d at 703 (hospital's engagement of legally-distinct medical staff in peer review process not actionable under § 1 because hospital and doctors were behaving as single entity in that context); Mount Pleasant, 838 F.2d at 276-77 (electric cooperative composed of legally distinct providers held to be single entity); Seabury Management, Inc. v. Professional Golfers' Ass'n of Am., Inc., 878 F. Supp. 771, 777 (D. Md. 1994) (PGA and partially owned regional golf association were, collectively, a single entity); cf. Brown v. Pro Football, Inc., 518 U.S. 231, 248-49 (1996) (in collective-bargaining context, the NFL looks "more like a single bargaining employer").

The plaintiffs propose that the "economic reality" test should be applied not only to *ignore* formal legal distinctions between separate corporations as the court did in Copperweld, but conversely to *envision* distinctions in what is formally a single legal entity when doing so would accurately describe how the business of the entity actually operates. The argument may have some

---

[10] The plaintiffs rely heavily on Sullivan, which rejected the NFL's argument that its teams had sufficient unity of interest to make the league a single entity under Copperweld. Sullivan does little to aid the plaintiffs because the NFL, despite certain similarities, is fundamentally different from MLS. The NFL is a confederation fused from agreements among preexisting, independently owned teams; unlike MLS, NFL football clubs do not exist as part of an overarching corporate structure. As explained in the text *infra*, MLS cannot be subjected to the wide-ranging analysis of economic interests that has been applied to the NFL. United States Football League v. NFL, 842 F.2d 1335 (2d Cir. 1988); Los Angeles Mem'l Coliseum Comm'n v. NFL, 726 F.2d 1381 (9th Cir. 1984); and North American Soccer League v. NFL, 670 F.2d 1249 (2d Cir. 1982), are distinguishable for the same reason.

superficial appeal, but on close examination it appears that it rests on a misconception of the scope of the Copperweld principle.

It was noted above that the courts have not given the sweeping language of § 1 its broadest possible effect. The "rule of reason" is an obvious example of a limitation on the literal scope of the statutory language. See Chicago Board of Trade v. United States, 246 U.S. 231, 238 (1918) (Brandeis, J.) ("[T]he legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence.").

The Copperweld rule similarly limits the reach of the statute's broad language. While concerted action between two separate corporations, one the parent and the other a subsidiary, could literally be described as a "combination" that restrains trade, the Supreme Court concluded that it was not the kind of combination that § 1 was intended to forbid. Like the coordination between a corporation and its unincorporated division, an agreement between a parent and its subsidiary did not represent "a sudden joining of two independent sources of economic power previously pursuing separate interests." Copperweld, 467 U.S. at 770. The plaintiffs are correct that the Court was looking to substance, not merely form.

But that does not mean that form is irrelevant. Copperweld does not support the proposition that a business organized as a single legal entity should have its form ignored, or its "veil" pierced, so that courts could examine whether participants in the firm have conducted concerted activity that would violate § 1. Merely posing that proposition suggests how troublesome it would be as a practical matter. It would permit the atomization of firms into their constituent parts, then to have the relationships of those parts examined to see if they produced anticompetitive effects that, had

16

they been brought about by independent economic actors, would have violated § 1. The number of companies that could be vulnerable to examination of internal business decisions under such an approach would be mind-boggling. No case has suggested that it would be appropriate to deconstruct a corporate entity in that way.

Practical objections aside, the theory is also fundamentally incompatible with the axiom the Copperweld Court's analysis started with – that coordination of business activities within a single firm is not subject to scrutiny under § 1. Copperweld cannot be understood to authorize an "economic reality" analysis that would require rejection of the very premise the holding of the case depended on. Moreover, the plaintiffs' proposition would plainly interfere with the objective of the antitrust laws. "Subjecting a single firm's every action to judicial scrutiny for reasonableness would threaten to discourage the competitive enthusiasm that the antitrust laws seek to promote." Copperweld, 467 U.S. at 775.

In sum, the plaintiffs' deconstruction efforts are unavailing. MLS is what it is. As a single entity, it cannot conspire or combine with its investors in violation of § 1, and its investors do not combine or conspire with each other in pursuing the economic interests of the entity. MLS's policy of contracting centrally for player services is unilateral activity of a single firm. Since § 1 does not apply to unilateral activity – even unilateral activity that tends to restrain trade[11] – the claim set forth in Count I cannot succeed as a matter of law.

---

[11] See Copperweld, 467 U.S. at 776 ("The appropriate inquiry . . . is not whether the coordinated conduct of a parent and its wholly owned subsidiary may ever have anticompetitive effects . . . . Nor is it whether the term 'conspiracy' will bear a literal construction that includes parent corporations and their wholly owned subsidiaries. For if these were the proper inquiries, a single firm's conduct would be subject to § 1 scrutiny whenever the coordination of two employees was involved. Such a rule would obliterate the Act's distinction between unilateral and concerted conduct, contrary to the clear intent of Congress, as interpreted by the weight of judicial authority.").

IV. THE FORMATION OF MLS

In addition to the claim that the player policies of MLS are an unlawful horizontal restraint of trade, the plaintiffs also claim that the very formation of MLS in the first place violated § 7 of the Clayton Act, which prohibits acquisitions or mergers the effect of which "may be substantially to lessen competition, or to tend to create a monopoly" in any line of commerce or activity affecting commerce, 15 U.S.C. § 18, as well as § 1 of the Sherman Act. The two theories are related.

A. The Clayton Act Claim

1. *Antitrust Injury*

Only those who have sustained injuries which the antitrust laws were designed to prevent may sue under § 7 of the Clayton Act. See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977); see also Philip E. Areeda, Antitrust Violations Without Damage Recoveries, 89 Harv. L. Rev. 1127, 1130-37 (1976). The defendants' first response to the § 7 claim is that the plaintiffs cannot establish an antitrust injury resulting from the formation of MLS. In making this argument, the defendants rely primarily on Alberta Gas Chemicals Ltd. v. E.I. DuPont de Nemours and Co., 826 F.2d 1235, 1242-43 (3d Cir. 1987).

Alberta Gas emphasizes the lesson that the antitrust laws provide remedies only for injury to *competition* itself, and not simply injury to *competitors*. A competitor adversely affected by a transaction that does not actually reduce the level of competition in the relevant market has no remedy under the antitrust laws. If the transaction defeats a competitor's expectations about how the market will evolve, but does not reduce the overall level of competition in the market in some manner injurious to the disappointed competitor, the dashed hopes are not a sufficient basis for an antitrust lawsuit. In Brunswick, for example, several independent bowling alley owners sued

Brunswick for acquiring and then revitalizing their once-ailing competitors. While these acquisitions thwarted a potentially advantageous market consolidation anticipated by the independent alley owners, there was no injury to competition itself. In fact, the revitalization of former competitors caused an increase in competition, and it was actually the prospect of greater competition which threatened to injure the plaintiffs. That was not an antitrust injury. See Brunswick, 429 U.S. at 488.

The principle is not entirely apt here. The plaintiffs are not simply suing on dashed hopes of a windfall, as the plaintiffs in Brunswick were. The new Division I soccer league the World Cup promoters promised to create could have been structured in the same way other sports leagues had been structured: a number of independently owned teams collaborating in certain aspects but competing with one another for player services. Clearly, compared to this traditional form of sports league, MLS's structure reduces competition for player services. The claim does assert an injury to competition cognizable under the antitrust laws.

### 2. *Existing Market*

Unfortunately for the plaintiffs, the claim is not otherwise viable. There can be no § 7 liability because the formation of MLS did not involve the acquisition or merger of existing business enterprises, but rather the formation of an entirely new entity which itself represented the creation of an entirely new market. The relevant test under § 7 looks to whether competition in *existing* markets has been reduced. See Brown Shoe Co. v. United States, 370 U.S. 294, 320-22 (1962) (§ 7 is a means for preventing the reduction of competition in existing markets); SCM Corp. v. Xerox Corp., 645 F.2d 1195, 1210-11 (2d Cir. 1981) (dismissing plaintiff's claim that acquisition of plain paper copying patents was a § 7 violation because, at the time of the acquisition, no market existed for plain paper copying). Where there is no existing market, there can be no reduction in the

level of competition. There are no negative numbers in this math; there is nothing lower than zero. Competition that does not exist cannot be decreased. The creation of MLS did not reduce competition in an existing market because when the company was formed there was no active market for Division I professional soccer in the United States.

The plaintiffs try two avenues around this obstacle to their claim. First, they argue that § 7 is designed to arrest anticompetitive transactions in their incipiency, see United States v. Penn-Olin Chem. Co., 378 U.S. 158, 171 (1964), so that it must apply not only to transactions that reduce existing competition, but includes also those transactions intended to stifle reasonably anticipated "potential competition." See Tenneco, Inc. v. Federal Trade Comm'n, 689 F.2d 346, 352 (2d Cir. 1982); Yamaha Motor Co. v. Federal Trade Comm'n, 657 F.2d 971, 977-78 (8th Cir. 1981).

The plaintiffs' reliance on the potential competition doctrine as explained in Penn-Olin and Yamaha is misplaced. In Penn-Olin, a vertical joint venture between two major participants in the sodium chlorate market was held to be subject to § 7 scrutiny. Similarly, in Yamaha, the Eighth Circuit applied § 7 to evaluate a proposed venture between the country's second largest seller of outboard motors and a major foreign producer that had not yet sold products here but had the ability to do so and concluded that the potential anticompetitive results of the venture were impermissible. In both cases, there was an existing, established relevant market, and the asserted violation was the preemption of likely competition in that market by the anticipatory acquisition of the potential competitors. The businesses already existed; it was the competition between them that was only "potential." Indeed, Yamaha cautions that the potential competition doctrine is limited to "acquisitions by a large firm in an oligopolistic market, if the acquisition eliminate[s] the acquired firm as a potential competitor, and if the acquired firm would otherwise have been expected to enter

20

the relevant market de novo." Yamaha 657 F.2d at 977.  Accord Tenneco, 689 F.2d at 352 (characterizing actual potential competitor doctrine as barring mergers that might increase oligopolistic behavior in existing markets).  In the present case, both the market for Division I professional soccer in the United States and the existence of any competitors in that market were only "potential" until the transaction that formed MLS occurred.  The "potential competition" doctrine does not apply in these circumstances.

The plaintiffs further argue that, even though no one was playing Division I soccer in the United States at the time MLS was created, the market nevertheless existed because the World Cup promoters had promised FIFA that a premiere soccer league would be established in the United States. As a result of the promise, they say, it was inevitable that there would be such a league.  The operator-investors in MLS, therefore, would likely have been competitors in a traditional soccer sports league.  The formation of MLS thwarted that prospective competition, violating § 7.

The expected market for Division I professional soccer in the United States at the time MLS was formed was much like the plain paper copying market when the relevant transactions in the SCM case occurred: it was foreseeable, perhaps even inevitable, but simply not yet in existence.  As in SCM, here too the conclusion must be that MLS's formation is not actionable under § 7.  The plaintiffs' attempt to distinguish SCM as an artifact of the occasionally tortured relationship between antitrust and patent law is not convincing.  The SCM court explicitly allowed that the acquisition of patents, like other assets, could form the basis of § 7 liability.  The court observed:

> The existing market provides the framework in which the probability and extent of an adverse impact upon competition may be measured. . . . [I]t would have been impossible to examine the effects of the [patent purchase] upon the relevant product market and submarket . . . because those markets did not come into being until [after the purchase].

SCM , 645 F.2d at 1211.

More fundamentally, the flaw in the plaintiffs' existence-by-inevitability argument is that the inevitability of a professional soccer league is not the same as the inevitability of multiple competitors. Granting that there would inevitably be a league, it was not inevitable that the league would be formed and would operate the same way as previous sports leagues. See Areeda, ¶ 1478d, at 358-59 (1986) (proposing a "Hypothetical Football League" that resembles MLS and differs from historical leagues). By its very existence MLS has shown that a sports league can be organized differently, at least when it comes to existence by creation and not by evolution.

The defendants are entitled to judgment in their favor on the Clayton Act claim.

B. The Sherman Act Claim

In addition to the Clayton Act theory, the plaintiffs urge that the formation of MLS, by which multiple operator-investors combined to create the single entity, also violated the Sherman Act's prohibition of contracts, combinations or conspiracies in restraint of trade.

It is generally held that a coming together that does not violate § 7 of the Clayton Act does not violate § 1 of the Sherman Act either. See White Consol. Indus. v. Whirlpool Corp., 781 F.2d 1224, 1228 (6th Cir. 1986) (failure to show Clayton § 7 violation precluded Sherman § 1 violation for same conduct). A merger of market participants that does not lessen competition and thus does not offend § 7 ordinarily would not constitute a combination in restraint of trade in violation of § 1. Though the statutory provisions present slightly different modes of analysis, when those modes are applied to the same constellation of facts, the answer will ordinarily be the same.

Here, the pertinent facts are that the founding investors of MLS created both a new company and simultaneously a new market, in effect increasing the number of competitors from zero to one. As explained above, that did not represent a lessening of actual or potential competition in an

22

existing market.  Similarly, it did not represent a "sudden joining of . . . independent sources of economic power previously pursuing separate interests," see Copperweld, 467 U.S. at 770, which is what is forbidden by § 1.

V.  CONCLUSION AND ORDER

For all the reasons set forth above, the defendants' motion for summary judgment in their favor under Counts I and IV of the Amended Complaint is GRANTED.  It follows that the plaintiffs' motion for summary judgment on the defendants' "single entity" defense is DENIED.

IT IS SO ORDERED.

_April 19, 2000_
DATE

_____
DISTRICT JUDGE